```
 1                    UNITED STATES DISTRICT COURT
 2                     SOUTHERN DISTRICT OF TEXAS
 3                          HOUSTON DIVISION
 4   VANTRERIUS MC KNIGHT,              .
                                        .
 5             Plaintiff,                .
                                        .  Civil Action
 6   VS.                                .  No. H-19-CV-2852
                                        .
 7   HELIX ENERGY SOLUTIONS GROUP, INC., .  Houston, Texas
                                        .  November 4, 2019
 8                                      .  11:03 a.m.
               Defendant.                .
 9   . . . . . . . . . . . . . . . . . .

10                    TRANSCRIPT OF PROCEEDINGS
                BEFORE THE HONORABLE LYNN N. HUGHES
11                     IN-CHAMBERS CONFERENCE

12   APPEARANCES:

13   FOR THE PLAINTIFF:

14         Mr. Curt Christopher Hesse
           MOORE & ASSOCIATES
15         440 Louisiana Street, Suite 675
           Houston, Texas 77002-1637
16         713.222.6775
           FAX:  713.222.6739
17         curt@mooreandassociates.net

18   FOR THE DEFENDANT:

19         Mr. Michael Carter Crow
           Ms. Kimberly Cheeseman
20         NORTON, ROSE, FULBRIGHT US, LLP
           1301 McKinney Street, Suite 5100
21         Houston, Texas 77010-3095
           713.651.5218
22         713.651.5160
           FAX: 713.651.5246
23         carter.crow@nortonrosefulbright.com
           kimberly.cheeseman@nortonrosefulbright.com
24
            PROCEEDINGS RECORDED BY STENOGRAPHIC MEANS,
25      TRANSCRIPT PRODUCED FROM COMPUTER-AIDED TRANSCRIPTION
```

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  COURT REPORTER:
2              GAYLE L. DYE, CSR, RDR, CRR
               515 Rusk, Room 8004
3              Houston, Texas   77002
               713.250.5582
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

|        |                                                                                  |
|--------|----------------------------------------------------------------------------------|
| 1      | PROCEEDINGS                                                                      |
| 2      | November 4, 2019                                                                 |
| 3      | (In chambers; conference in progress.)                                           |
| 4      | THE COURT: The book has -- no, it's detailed                                     |
| 5      | treatment of his service in Europe which was harrowing, the                      |
| 6      | least of it. After they did the Normandy thing, it's one of                      |
| 7      | those perverse outcomes. You know, like, he does you. You're                     |
| 8      | really good at some things, so he finds all of them in the firm                  |
| 9      | and gives them to you.                                                           |
| 10     | And then, you know, he didn't consider himself a                                 |
| 11     | politician; but he came back and did that; and he just kept                      |
| 12     | solving problems. And he was a very affable guy. When he made                    |
| 13     | a decision, you knew it had been made.                                           |
| 14     | All right. Is this McKnight?                                                     |
| 15     | MR. HESSE: Yes, your Honor.                                                      |
| 16     | THE COURT: And what -- where are we with developing                              |
| 17     | his claim? We might as well start with their complaint that                      |
| 18     | he's a seaman and not a pseudo land-based fellow.                                |
| 19     | MR. HESSE: So, this is actually the second iteration                             |
| 20     | of a similar lawsuit. And so, we've fleshed out all those                        |
| 21     | details before. And I think I have probably 95 percent of the                    |
| 22     | materials that I need. But as you point out, they claim he's a                   |
| 23     | seaman.                                                                          |
| 24     | There are two exemptions under (a)(12) and                                       |
| 25     | (b)(6). The one is for foreign flag vessels, and one is for US                   |

Timestamps:
- 11:03:30 (line 5)
- 11:03:58 (line 10)
- 11:04:32 (line 15)
- 11:05:01 (line 20)
- 11:05:23 (line 25)

Gayle Dye, CSR, RDR, CRR - 713.250.5582

|   |   |
|---|---|
|  | 1  flag vessel.  The only thing that I really need to see now is |
|  | 2  the vessel registration so that we can -- and I think they're |
|  | 3  both US flag -- |
|  | 4             THE COURT:  All you have to do is look at Lloyd's |
| 11:05:36 | 5  list.  They're all there. |
|  | 6             MR. HESSE:  It's not.  When I was in the Coast Guard, |
|  | 7  it was never quite that accurate. |
|  | 8             THE COURT:  Let's just start from that because, if |
|  | 9  they say they're American flagged and they're listed in Lloyd's |
| 11:05:50 | 10 list American -- actually, probably -- what's the home port of |
|  | 11 the Helix submarine? |
|  | 12            MS. CHEESEMAN:  Typically, out of Houston, your Honor. |
|  | 13            THE COURT:  No.  You can sail out of Houston all the |
|  | 14 time, but your home port can be Hyannis Port.  That would really |
| 11:06:19 | 15 freak them out, wouldn't it, to register a commercial ship up |
|  | 16 there? |
|  | 17            MS. CHEESEMAN:  We'll have to confirm the home port. |
|  | 18            THE COURT:  And I don't know the name of it, but |
|  | 19 there's a website where, without paying anything, you can see |
| 11:06:42 | 20 every ship, where it is, where it's headed. |
|  | 21              Do you remember what it's called? |
|  | 22            MR. CROW:   (Indicated no.) |
|  | 23            MR. HESSE:  I think it's something generic like |
|  | 24 shiptracker.com. |
| 11:06:57 | 25            THE COURT:  Yeah.  Something like that.  So, you have |

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  that.  I don't need it very often; but when I do, it's handy.
2  The problem is sometimes I just decide I need to check.  It can
3  eat into your productive time.
4             If it is an American vessel, how does the Fair
5  Labor Standards Act apply to it?
6             MR. HESSE:  So, it actually -- there's a Fifth Circuit
7  case from years ago.
8             THE COURT:  Wait a minute.  Just tell me what -- the
9  Fair Labor Standards Act is the law, and that includes the
10 exception.  What does the law say about it?
11            MR. HESSE:  The law exempts from the overtime
12 requirements of the FLSA any seaman boarding an American flag
13 vessel.
14            THE COURT:  And what -- do you think McKnight was not
15 a seaman?
16            MR. HESSE:  I don't, Judge.  He was, essentially, a
17 cook.  So, I guess the way it's --
18            THE COURT:  A cook on a ship is a member of the crew.
19 We went through that when geophysicists didn't want to be
20 covered as a seaman.  In fact, somebody in this room wrote an
21 opinion about that.  May have been about the geophysicist
22 equipment.
23            But we had a bunch of cases where all of the
24 experts and -- for instance, you know, it's defining something
25 about the navigation of the vessel.  And some pigeon-minded

1  judges wanted that to mean "But they got to steer and hoist
2  sails."  But cooks; if they had a doctor, they didn't.
3  Harpoonists didn't.  They didn't do it.  They didn't stand
4  watches because they were too valuable to send up there.
5             And so, the same way -- a geophysicist goes to
6  sea as a sailor.  You know, in that case, the purpose of the
7  vessel is to take him over parts of the ocean floor that he
8  wants to look at.  That's no different than taking freight to
9  Hong Kong.  Just something that wasn't thought of in 1935.
10            MR. HESSE:  That's true.
11            MS. CHEESEMAN:  And, your Honor, steward is actually
12 one of the positions listed in some of the federal regulations
13 as being seen as the traditional crew that are -- as an example
14 given as seaman.  And I have a copy for counsel and the Court.
15            THE COURT:  I'm one of those curmudgeons who's worried
16 about the Department of Labor interpreting a statute so it says
17 what it -- the statute -- I like to start with the statute.  I
18 think it was Justice Stevens wrote an article, Shakespeare 12
19 Candidates of Interpretation; and it was full of intentionally
20 literary citations, I think, as I recall; but young Shakespeare.
21 You know, he hasn't written much lately.
22            The first one was read the statute.  The second
23 was, no, read the whole statute, which gets increasingly hard.
24            MR. HESSE:  There sure are a lot of them.
25            THE COURT:  And they're unnecessarily long with

1  numbering systems that make no sense.  Sub "A" will be the
2  principle subpart for 19 variations; and so, the statute,
3  without the benefit of this and lots of other people, held that,
4  if you work on a ship, you're part of the crew.
5              They may have somebody whose sole job is to fix
6  the cable TV receptor or something so the crew doesn't mutiny.
7  But that's an essential part of the ship.  So, under the
8  regulations that apply to seamen, was -- he's not owed overtime?
9              MS. CHEESEMAN:  Yes, your Honor.
10             THE COURT:  So, what do you want to do?
11             MR. HESSE:  Well, Judge, there's some other
12  regulations in a case that say for seamen, if you're cooking for
13  more -- if you prepare meals for more than 20 percent of a crew
14  -- and this is the Department of Labor's interpretation of the
15  statute.
16             So, if you're cooking for a crew, 20 percent of
17  whom aren't traditional seamen, for example, roustabouts or
18  other oil workers, you're not a seaman for purposes of the act.
19             THE COURT:  Okay, that's fine; but it's idiotic; and
20  I'm not going to follow it.  What do you do with passengers?
21             MR. HESSE:  I --
22             THE COURT:  You're not a seaman if you cook for
23  passengers?
24             MR. HESSE:  I think that's the way it's been
25  interpreted, but most --

1  THE COURT: It makes no sense. Feeding the crew and
2 feeding passengers who are the purpose of the vessel's voyage
3 are seamen. You can't just say, "Oh, well, the statute says
4 this; but we're the Department of Labor; and we think that if
5 you're a non-traditional seaman" -- do you know how many people
6 that applies to? Every passenger, news reporters, photographers
7 on a -- you know, on a *National Geographic* cruise. Would they
8 count?
9  MR. HESSE: I don't think so under the -- that
10 interpretation of the statute, under the department's
11 interpretation.
12  THE COURT: Why not?
13  MR. HESSE: I don't know the policy behind it.
14  THE COURT: We're talking about a statute.
15  MR. HESSE: Right.
16  THE COURT: That's the problem. The Department of
17 Labor would say everybody was susceptible to whatever their
18 regulation is at the moment. I would be happy if they would
19 just keep their website up to date so I can check what the
20 minimum wage is.
21  Sometimes you just need to check things like
22 that. I checked once, and it was a ten-year-old minimum wage,
23 but they do that to help people. It makes no sense.
24  MS. CHEESEMAN: And your Honor, there are cases -- and
25 I brought a copy, if you would like it, involving cruise ships

```
                1   where --
                2            THE COURT:  Are they written any by me?
                3            MS. CHEESEMAN:  No.  This one actually is from the
                4   District of Massachusetts involving some boats -- cruise ships
11:15:10        5   that leave the Massachusetts harbor.
                6            THE COURT:  Who's the judge?
                7            MS. CHEESEMAN:  Judge O'Toole.
                8            THE COURT:  I don't know him.  But I don't know many
                9   judges anymore.
11:15:21       10            MS. CHEESEMAN:  And involving cruise ships, and that
               11   exact argument of just because stewards --
               12            THE COURT:  He stole it from him.
               13            MS. CHEESEMAN:  And I flagged sort of a page where
               14   they discuss it, where the fact that cooks and stewards may be
11:15:35       15   providing services to passengers does not necessarily take them
               16   out of the seaman exemption.
               17            THE COURT:  Well, you can't -- I mean, if the ship's
               18   purpose is taking drunken tourists from "A" to "B," the
               19   bartender is a seaman.  He's working.  He's part of the ship.
11:15:59       20   And when you say traditional seaman, I don't know what they
               21   think because traditional seamen have many fewer jobs due to the
               22   miracle of mechanization; and they live longer, too.
               23                So, how about the person who cares for a load of
               24   live cattle?  Breeding stock is frequently shipped live.  It
11:16:30       25   works better that way.  So, the cowboy, he's probably a
```

```
                 1  passenger; but he's working because, if the ship doesn't -- the
                 2  bulls to whichever country needs them, they have to be live to
                 3  be of any use.
                 4           Of course, now, you just airfreight semen.  It's
11:17:00         5  more efficient.
                 6           Do you have another one of these?  Is this your
                 7  best case?
                 8           MS. CHEESEMAN:  This case sort of directly addresses
                 9  the cruise ship passenger issue, and the Court granted summary
11:17:21        10  judgment for the company on the seaman exemption.
                11           THE COURT:  I'm sure Helix is probably a fine ship,
                12  but I don't think anybody would mistake it for a cruise ship.
                13           MR. HESSE:  I don't think so either.
                14           THE COURT:  Well, now we have cruise ships that make
11:17:39        15  circles that come -- that start here and come back here; and so,
                16  it's more like a sightseeing bus; but it's still a sightseeing
                17  bus at sea.
                18           Have you moved for anything?
                19           MS. CHEESEMAN:  We have not yet, your Honor.
11:18:05        20           THE COURT:  Do you want to?
                21           MS. CHEESEMAN:  Yes, your Honor.
                22           THE COURT:  Why don't you?
                23           MS. CHEESEMAN:  We can.
                24           THE COURT:  How long do you need?  Thursday?
11:18:15        25           MS. CHEESEMAN:  That would be -- I would be super
```

1  human if I could do Thursday.
2              THE COURT:  That's what he says you are.
3              MR. CROW:  No doubt.
4              MS. CHEESEMAN:  A month, your Honor?
11:18:29  5  THE COURT:  You've already done the bracing and
6  everything.  Two weeks?
7              MS. CHEESEMAN:  Two weeks?
8              THE COURT:  There will be a firm date in there --
9              MS. CHEESEMAN:  Sure, okay.
10             THE COURT:  -- in the order.
11                And two weeks to respond?
12             MR. HESSE:  I think that would fall in the middle of
13 the Thanksgiving holiday; and I don't mind doing it, Judge; but
14 my wife might be disappointed.
11:18:51 15  THE COURT:  I'll do that if you can tell me the
16 precise origins of Thanksgiving.
17             MR. HESSE:  Well, my son has been watching a *Charlie
18 Brown Thanksgiving*.  So, unless that is historically accurate,
19 I'm going to give you a skewed response based on my viewing of
11:19:09 20 that television episode about four times this weekend; but --
21             THE COURT:  Isn't it fun?
22             MR. HESSE:  It is.
23             THE COURT:  I think I can tell you the words to
24 *Raggedy Ann and Andy's Raining Day Circus* now, and the person
11:19:29 25 who wanted to hear it is now 49 years old.  But whoever composed

1  *Tomorrow* for Annie, if I ran into them, I would kill them
2  because for a year she wandered around the house singing
3  *Tomorrow*.
4             And fortunately, my sense of music is not
11:19:51  5  sophisticated or keen.  I love music; and so, when everybody
6  else thinks they're off key, I don't care.  I don't know they're
7  doing something.  I can't even do it off key, so I'm really
8  impressed.
9             MR. HESSE:  Now, it's shows like *Frozen*; and the music
11:20:08  10 is quite good.  But when you hear it, you know, 20 or 30 times
11 in a day, it gets -- it's a little painful.
12            THE COURT:  Have you been to Disneyland, I guess, in
13 -- the one in California?
14            MR. HESSE:  Yes.
11:20:21  15            THE COURT:  Have you gone on *It's a Small World*?
16            MR. HESSE:  Yes, I have.
17            THE COURT:  You know, that's, what, 12 minutes maybe?
18            MR. HESSE:  Right.
19            THE COURT:  And so, I think we get rid of capital
11:20:32  20 punishment and send them so they go around.  That's the longest
21 12 minutes I've ever -- but she'll grow out of it.  Or he?
22            MR. HESSE:  He will.  I hope he does.
23            THE COURT:  He will.  But just whether he grows up to
24 like books and reading and know things or whether he likes to
11:20:57  25 play sports only, you have some influence on him.  Control,

1  forget it.
2             So, I take it you don't know the origin?
3         MR. HESSE:  Well, I mean, I can tell you the grade
4  school story; but I'm sure that --
5         THE COURT:  No.  That's what everybody operates from.
6  It is.  That's what I call the Hallmark version.  A fellow you
7  may have heard of named George Washington had been inaugurated
8  President of the United States a couple of months before, and he
9  wrote and gave a very long proclamation about a day of
10 Thanksgiving for our new government under the Constitution.
11            It didn't have anything to do with pumpkin pie or
12 Indians or non-Indians.  That's how people who don't love their
13 history lose track of what it really is.
14            And yes, I told my children, when small, that.  I
15 also explained Halloween.  Do you know why we have Halloween
16 when all the ghosts are out?  The next day is All Saints' Day;
17 and so, they got to get what they're doing done because they're
18 not about to go out on All Saints' Day.  So, it's All Hallows'
19 Eve.
20            It's a bad night for spooks -- or a good night, I
21 guess, because they get to party all night; and all the other
22 people -- other people are getting ready for the next day.  But
23 an employee of mine once said, "Tell me about Halloween."
24            I said, "Well, yes, ma'am.  May I ask why you
25 ask?"

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1                    And she said her son was in some parochial school
2    in both senses of the word and missed school.  The church
3    frowned on it.  That's devil worship what they do on Halloween.
4    Of course, quite the contrary; but I explained it to her.  Now,
5    she thought they were crazy.  Now, she knew they were crazy.
6              MR. HESSE:  Well, I'm sure glad we worked the food
7    into Thanksgiving because that's probably my favorite part of
8    the -- it may be my favorite holiday of the year, all because of
9    the food.
10             THE COURT:  So, you-all tell me if I set something
11   where there's genuine personal plans; and it doesn't have to be
12   small children or angry wives.  It can be a deer that you want
13   to kill or a cruise to Patagonia or what -- you-all need to do
14   something for fun.  So, when you actually planned it, I'm happy
15   to work around it.
16                  So, today is the 4th.  Two weeks would have been
17   the 18th.  So, I guess you better get it done by the 10th?  When
18   do you want to do it?
19             MR. HESSE:  Oh, you're -- me?
20             THE COURT:  He doesn't let her have time off.
21             MR. HESSE:  I would like to respond the week after
22   Thanksgiving.
23             THE COURT:  Okay.
24             MR. HESSE:  If that's acceptable.
25             THE COURT:  Sure.  I'm going to put the end of that

11:23:22 (line 5)
11:23:40 (line 10)
11:24:10 (line 15)
11:24:33 (line 20)
11:24:44 (line 25)

1  week as the date in the order; but if you want to do it before
2  then, you always can.
3             Occasionally, nobody catches me; and I will have
4  set something on a Sunday when a paper is due.  My staff gets
5  these phone call.  "Well, that's Sunday."  Well, do it on
6  Saturday.  You don't have to do it on the deadline, you have to
7  file by.  So, a week earlier you can file it and everybody is
8  happy.
9             All right.  Anything else we can do with this
10 one?
11            MS. CHEESEMAN:  No, your Honor.
12            THE COURT:  Where did you go to law school?
13            MS. CHEESEMAN:  Tulane.
14            THE COURT:  Not very long ago, I take it?
15            MS. CHEESEMAN:  Seven, eight years ago.
16            THE COURT:  How was it?
17            MS. CHEESEMAN:  I loved it.
18            THE COURT:  How much did you learn?
19            MS. CHEESEMAN:  I also did -- I did the common law
20 track; but then, I stayed in Louisiana for a year after and then
21 took the Louisiana bar, as well.  So, I did some civil law.  So,
22 I consider myself half civilian.
23            THE COURT:  They say that -- good.  But stay in good
24 stead because they're going to be there.  I mean, nothing we can
25 do about that.  So, every once in a while something exotic will

1  crop up.
2              A retired bankruptcy judge and I shared a case
3  which involved Louisiana land law, and I'm pretty good with
4  Texas land law.  I made a living at it before I got this cushy
5  job.  It was kind of fun, the law is; but he just couldn't
6  believe that it was that different; and most of it is not.
7          MS. CHEESEMAN:  Just terms really.
8          THE COURT:  And -- well, and maybe a procedural glitch
9  here and there.
10         MS. CHEESEMAN:  Right, right.
11         THE COURT:  I had two lawyers filing things and
12 arguing with each other -- and I mean arguing arguing, not
13 debating -- about choice of law, that it had to go to New York.
14             I said, "Well, no, I got to apply New York.  But
15 let me just ask you what is the difference that makes the
16 matter?"
17             "Oh, there's not one."
18             Well, next time just bill your client for the
19 time and pretend you argued before me; and let's just move on.
20 In fact, I wrote a decision which has become widely regarded in
21 Montana.  It's about the application of offset and recoupment to
22 operating revenues for an oil well under Montana law.  But that
23 feels good.  I solved a problem for a bunch of nice people.
24             I had a suit where the question was where do you
25 file a lien on an offshore vessel or offshore platform or

1  offshore anything.  And so, the Public Lands Office, which keeps
2  changing its name to protect the guilty, said, "No.  Well, you
3  file them with us."
4              Well, that's going to be a surprise to a whole
5  bunch of states.  And one argument was it would just be too much
6  trouble to figure out which county is the nearest adjacent
7  county.  So, you got a $150 million rig and you got a $700,000
8  lien.  And it's too much trouble to sort out which county?
9              So, I had an unlucky law clerk go down to the
10 library and count the counties from Key West to Brownsville.
11 42, as I recall.
12             MS. CHEESEMAN:  Wow.
13             THE COURT:  So, that kind of thing, you could afford
14 to register your lien in all 42 counties.
15             MR. HESSE:  That's right.
16             THE COURT:  But you could bypass three or four of
17 them, and nobody would even notice it.
18             MS. CHEESEMAN:  Right.
19             THE COURT:  And so, I published that; and I --
20 somewhere in some lawyer thing.  And this guy came up; and he
21 said, I'm not a litigator so you don't know.  My name is
22 so-and-so.  But thank you so much for somebody versus -- some
23 hospitality versus Shell or something like that.
24             "Well, thank you."  And he explained why.
25 Everybody was arguing about it; and then, the feds want to try

|  |  |
|---|---|
|  | 1   to get into it.  So, apparently, it succeeded.  But you've made |
|  | 2   a lot of people's life simpler which makes the value of the |
|  | 3   properties all slightly more valuable.  That's -- those are |
|  | 4   important cases. |
| 11:30:02 | 5              MS. CHEESEMAN:  Uh-huh, right. |
|  | 6              THE COURT:  When I was interviewed by the ABA for |
|  | 7   their recommendation, they said, "Well, what's your biggest |
|  | 8   case?" |
|  | 9              And I said, "What do you mean by 'biggest?'" |
| 11:30:16 | 10             And they said, "Most money." |
|  | 11             That's not the biggest case. |
|  | 12             MS. CHEESEMAN:  Right. |
|  | 13             THE COURT:  Skelly had the position that federal court |
|  | 14  should be reserved for big cases which he, apparently, meant |
| 11:30:32 | 15  dollar amount or something.  So, I asked him how much Mary Beth |
|  | 16  Tinker's armband was. |
|  | 17             Did you go to law school? |
|  | 18             MR. HESSE:  Did I go to law school?  I think so.  Yes, |
|  | 19  I did. |
| 11:30:46 | 20             THE COURT:  *Tinker versus Des Moines School District.* |
|  | 21  This middle school girl wore an armband -- a black armband as a |
|  | 22  piece of Vietnam symbol.  And some student said if she didn't |
|  | 23  take it off, he was going to rip it off.  So, they kicked her |
|  | 24  out for causing a disturbance.  He caused the disturbance. |
| 11:31:13 | 25             Back when he was in law school, he read the one |

Gayle Dye, CSR, RDR, CRR - 713.250.5582

1  about the guy in the park in New York who was probably offending
2  most of the crowd; but that's why you have free speech.  So, one
3  of the onlookers said to the police officer standing by "You
4  better get him down off of there or I will."
5              So, the officer arrested the speaker.  No, you
6  arrest the troublemaker.  And then, it cropped back up.
7              But the fact was Mary Beth's armband was very,
8  very valuable because it was her speech; and that she was 13 or
9  something does not alter the value of the speech.  If they screw
10 up the 1st Amendment, none of the rest of them count.
11             MS. CHEESEMAN:  Right.
12             THE COURT:  I guess you saw where New York City has
13 outlawed the use of "illegal alien" and about 20 other terms.
14 It's a crime.
15             MR. CROW:  A criminal matter.
16             THE COURT:  Just to use a term in common usage in
17 America.  It drives me crazy.  I like the 1st Amendment.  It
18 doesn't apply to your high school principal when you're smarting
19 off.  But I should have gone to law school first.
20             All right.  Where did you go to undergraduate
21 school?
22             MS. CHEESEMAN:  Duke University.
23             THE COURT:  What did you study?
24             MS. CHEESEMAN:  I was a political science and public
25 policy major.


                    Gayle Dye, CSR, RDR, CRR - 713.250.5582

```
11:33:13




11:33:39




11:34:01
```

 1             THE COURT:  That's low-hanging fruit, isn't it?
 2             So, I figured out next time you go to college,
 3  pick a topic with a faculty of three or four.  You'll make an
 4  "A" because, if you don't, one of them is going to get shot.
 5             And so, I got a degree in anthropology because I
 6  really liked it and had no idea what I was going to do with my
 7  life at that point.  And it occurred to me that if the seven or
 8  eight of us in the advanced undergraduate courses weren't there,
 9  there's going to be somebody.
10             I think we only had three professors to start
11  with.  It turns out anthropology is real handy.  I sit here all
12  day and watch what people do, listen to what they tell me was
13  done, what they meant to do, and try to figure out what was
14  really going on.
15             And I did well in anthropology but not because it
16  was small but because my grades were always better in things I
17  wanted to study.  The required stuff I was obliged to, not so
18  much.
19          MR. HESSE:  Good to see you, Judge.
20      (Proceedings concluded at 11:34 a.m.)
21
                      C E R T I F I C A T E
22
       I certify that the foregoing is a correct transcript
23  from the record of proceedings in the above-entitled matter, to
    the best of my ability.
24
    By: /s/Gayle L. Dye                    12/ 27/ 2019
25      Gayle L. Dye, CSR, RDR, CRR        Date



                Gayle Dye, CSR, RDR, CRR - 713.250.5582